**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN TEIXEIRA; STEVE
NOBRIGA; GARY GAMAZA;
CALGUNS FOUNDATION, INC.,
(CGF); SECOND AMENDMENT
FOUNDATION, INC., (SAF);
CALIFORNIA ASSOCIATION OF
FEDERAL FIREARMS LICENSEES,
(CAL-FFL),
*Plaintiffs-Appellants*,

v.

COUNTY OF ALAMEDA;
ALAMEDA COUNTY BOARD OF
SUPERVISORS, as a policy
making body; WILMA CHAN, in
her official capacity; NATE
MILEY, in his official capacity;
KEITH CARSON, in his official
capacity,
*Defendants-Appellees.*

No. 13-17132

D.C. No.
3:12-cv-03288-WHO

OPINION

Appeal from the United States District Court
for the Northern District of California
William Horsley Orrick III, District Judge, Presiding

Argued and Submitted December 8, 2015
San Francisco, California

Filed May 16, 2016

Before: Diarmuid F. O'Scannlain, Barry G. Silverman,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge O'Scannlain;
Partial Concurrence and Partial Dissent by
Judge Silverman

## SUMMARY[*]

### Civil Rights

The panel affirmed in part and reversed in part the district court's dismissal for failure to state a claim, and remanded in an action brought by three individuals wishing to operate a gun shop in Alameda County, California, who challenged a County ordinance, which among other things, does not permit prospective gun stores to be located within 500 feet of a residentially zoned district.

Affirming the dismissal of the Equal Protection claims, the panel determined that this was not a situation where one group was being denied a right while another similar group was not. The panel held that because the right to keep and to bear arms for self-defense is not only a fundamental right, but an enumerated one, it was more appropriately analyzed under the Second Amendment than the Equal Protection Clause. The panel further held that plaintiffs failed to plead a

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

cognizable class-of-one claim because they had neglected to identify a similarly situated business.

Reversing the dismissal of plaintiffs' Second Amendment claims, the panel held that the County had offered nothing to undermine the panel's conclusion that the right to purchase and to sell firearms is part and parcel of the historically recognized right to keep and to bear arms. The panel held that the Ordinance burdened conduct protected by the Second Amendment and that it therefore must be subjected to heightened scrutiny—something beyond mere rational basis review.

The panel held that under heightened scrutiny, the County bore the burden of justifying its action, and that the district court should have required the County to provide some evidentiary showing that gun stores increase crime around their locations or negatively impact the aesthetics of a neighborhood. The panel held that if on remand evidence did confirm that the Ordinance as applied, completely bans new guns stores (rather than merely regulating their location), something more exacting than intermediate scrutiny would be warranted.

Concurring in part and dissenting in part, Judge Silverman agreed that the equal protection claims were correctly dismissed, but dissented from the majority's opinion regarding the Second Amendment. In Judge Silverman's view this case was a mundane zoning dispute dressed up as a Second Amendment challenge and the district court correctly ruled that the ordinance restricting the location of a gun store is "quite literally a 'law[] imposing conditions and qualifications on the commercial sale of arms.'"

**COUNSEL**

Donald E. J. Kilmer, Jr., San Jose, California, argued the cause and filed the briefs for the plaintiffs-appellants. With him on the opening brief was Charles W. Hokanson, Long Beach, California.

Scott J. Feudale, County Counsel, Alameda County, California, argued the cause for the defendants-appellees. Donna R. Ziegler, County Counsel, and Mary Ellyn Gormley, Assistant County Counsel, filed the brief.

Alan Gura, Gura & Possessky, PLLC, Alexandria, Virginia, filed a brief on behalf of amicus curiae Citizens Committee for the Right to Keep and Bear Arms in support of the plaintiffs-appellants. Imran A. Khaliq, Arent Fox LLP, filed a brief on behalf of amici curiae Law Center to Prevent Gun Violence and Youth Alive! in support of the defendants-appellees.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether the right to keep and to bear arms, as recognized by the Second Amendment, necessarily includes the right of law-abiding Americans to purchase and to sell firearms. In other words, we must determine whether the Second Amendment places any limits on regulating the commercial sale of firearms.

I

A

In the fall of 2010, John Teixeira, Steve Nobriga, and Gary Gamaza decided to open a retail business that would offer firearm training, provide gun-smith services, and sell firearms, ammunition, and gun-related equipment. The three formed a partnership named "Valley Guns & Ammo" and set to work on making their plan a reality. The trio conducted an extensive survey of Alameda County, California residents and discovered that existing retail establishments failed to satisfy customer demand. The men believed that Alameda County residents were in need of a more personal experience, and were likely to embrace a business that could provide a broader range of services not offered by existing sporting goods retailers. The City of San Leandro appeared to be the ideal location for their gun store.

Teixeira had operated an Alameda County gun store previously and was thus well aware of the maze of federal, state, and local regulations that he and his partners would have to navigate before they could open shop. Teixeira and

Nobriga qualified for federal firearm licenses; all three men were eligible for California licenses. All that remained was to ensure that Valley Guns & Ammo would be in compliance with the Alameda County code.

In unincorporated Alameda County, two species of retailers must obtain "Conditional Use Permits" before they are authorized to conduct business: "superstore[s]" and "firearms sales business[es]." Alameda Cty., Cal., Code §§ 17.54.130–132 ("the Ordinance"). The County reviews applications to determine whether there is a "public need" for a proposed business, whether the business will "affect adversely the health or safety of persons residing or working in the vicinity," and whether the business would be detrimental to the public welfare or property. *Id.* § 17.54.130. The County will not issue a permit to a prospective gun retailer until the applicant proves, among other things, that it (1) possesses the requisite state and federal licenses, (2) will store firearms and ammunition lawfully, and (3) the proposed location of the business is not within five hundred feet of a "[r]esidentially zoned district; elementary, middle or high school; pre-school or day care center; other firearms sales business; or liquor stores or establishments in which liquor is served." *Id.* §§ 17.54.130–131. Finally, firearms sellers must obtain a county firearms dealer license. *Id.* § 17.54.131.

The Alameda County Planning Department informed Teixeira, Nobriga, and Gamaza (collectively "Teixeira") that the 500-foot zoning requirement was to be measured from the closest door of the proposed business location to the front door of any disqualifying property. Relying on such guidance, Teixeira settled on a suitable property on Lewelling Boulevard in San Leandro. The building he chose had only one door, which faced Lewelling Boulevard. Teixeira

obtained a survey showing that the closest residential property (from door to door) was located 532 feet away, across Interstate 880 in San Lorenzo Village. The next closest disqualifying properties, similarly measured, were a residence located 534 feet away and another property located 560 feet away (the latter also on the far side of the Interstate). Teixeira met with the landlord of the chosen premises, agreed to a lease, and began conducting preparations to ensure that the property would comply with myriad state and federal regulations.

The West County Board of Zoning Adjustment scheduled a hearing and the Planning Department issued a "Staff Report." Aside from raising concerns regarding compliance with the "Eden Area General Plan,"[1] the report found that there was indeed a "public need" for Valley Guns & Ammo's services, that the proposed business would not affect adversely the health or safety of local residents, that it had obtained all required licenses, and that Teixeira had sufficient knowledge to operate a gun store. The report nevertheless concluded that a zoning variance would be required because the proposed site, contrary to the survey Teixeira had commissioned, was in fact within 500 feet of a residential property and therefore failed to qualify for a permit. The report explained that the County had chosen to measure from the closest building exterior wall of the proposed site to the closest residential property line rather than from door to door. As a result, it determined that the nearest residential property was only 446 feet away—54 feet too close under the 500-foot rule. The report recommended against approving a variance.

---

[1] The Eden Area General Plan deals largely with aesthetics and has a stated goal of "[e]stablish[ing] a clearly defined urban form and structure to the Eden Area in order to enhance the area's identity and livability."

Despite the report, at a public hearing on December 14, 2011, the West County Board of Zoning Adjustments voted to grant a variance and approved the issuance of a permit. Noting the violation of the 500-foot rule, the Board reasoned that the "situation [was] unique" and thus a variance was appropriate because Interstate 880, as well as other obstructions, prevented "direct traversable access at a distance less than 500 feet from the site to a residentially zoned district." The Board determined that Teixeira's proposal otherwise complied with the Conditional Use Permit requirements, and that it was not counter to the Eden Area General Plan. Teixeira was informed that the decision would be final unless an appeal were filed by December 26, 2011.

The San Lorenzo Village Homes Association, some of whose members "are opposed to guns and their ready availability and therefore believe that gun shops should not be located within [their] community," challenged the Board's decision. On February 28, 2012, the Alameda County Board of Supervisors voted to sustain the appeal, thus revoking Teixeira's Conditional Use Permit and variance.

B

Teixeira challenged the County's decision in the United States District Court for the Northern District of California, arguing that it violated his right to due process and denied him equal protection of the law, and that the Ordinance was impermissible under the Second Amendment both facially and as applied. In preparation for the suit, Teixeira commissioned a study, which determined that, as a result of the 500-foot rule, "there are no parcels in the unincorporated areas of Alameda County which would be available for firearm retail sales." He argued that the zoning ordinance "is

not reasonably related to any possible public safety concerns" and effectively "red-lin[es] . . . gun stores out of existence."

Alameda County moved to dismiss the claims and Teixeira moved for a preliminary injunction (Teixeira would later stipulate to the dismissal of his due process claim). The district court denied Teixeira's motion and dismissed the equal protection and Second Amendment claims with leave to amend. Teixeira filed an amended complaint that asserted four claims: (1) in singling out gun stores, the Ordinance, as applied, violated the Fourteenth Amendment's Equal Protection Clause; (2) the Ordinance was facially invalid under the Equal Protection Clause because it targeted guns stores but did not apply to other similarly situated businesses; (3) the Ordinance was facially invalid under the Second Amendment; and (4) the Ordinance, as applied, violated the Second Amendment. Teixeira sought declaratory and injunctive relief; damages including costs, expenses, and lost profits; and costs and attorney's fees. In response, the County moved to dismiss, arguing that the equal protection challenges failed to state sufficient facts to support a claim and that under the Second Amendment, regulations governing the sale of firearms are presumptively valid.

The district court granted the County's motion under Federal Rule of Civil Procedure 12(b)(6) to dismiss for failure to state a claim upon which relief could be granted. Teixeira timely appealed.

II

Teixeira first renews his Equal Protection Clause claims. Because "most legislation classifies for one purpose or another, with resulting disadvantage to various groups or

persons," we will uphold a legislative classification so long as it "neither burdens a fundamental right nor targets a suspect class," and "bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996); *see also Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

## A

Because gun store owners have not been recognized as a "suspect class," *see Olympic Arms v. Buckles*, 301 F.3d 384, 388–89 (6th Cir. 2002), Teixeira instead asserts that he is "engaged in, or assisting others in exercising a core fundamental right" and that "the Government's actions infringe on" that right. Merely infringing on a fundamental right, however, does not implicate the Equal Protection Clause; to succeed, Teixeira must allege that he is being denied a fundamental right while others are permitted to exercise such right, and that there is no valid justification for the distinction. *See Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942) ("When the law lays an unequal hand on those who have committed intrinsically the same quality of offense and sterilizes one and not the other, it has made as an invidious a discrimination as if it had selected a particular race or nationality for oppressive treatment."); *see also Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621 (1969); *Shapiro v. Thompson*, 394 U.S. 618 (1969), *overruled, in part, on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974). Here, "other general retailers," whom Teixeira identifies as similarly situated businesses, are also forbidden from engaging in the commercial sale of firearms absent compliance with Alameda County Land Use Code § 17.54.131. This is not a situation where one group is being denied a right while another similar group is not. And because the right to keep and to bear arms for self-defense is

not only a fundamental right, *McDonald v. City of Chicago*, 561 U.S. 742, 766–78 (2010), but an enumerated one, it is more appropriately analyzed under the Second Amendment than the Equal Protection Clause. *Cf. Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989))). Because Teixeira's equal protection challenge is "no more than a [Second] Amendment claim dressed in equal protection clothing," it is "subsumed by, and co-extensive with" the former, *Orin v. Barclay*, 272 F.3d 1207, 1213 n.3 (9th Cir. 2001), and therefore is not cognizable under the Equal Protection Clause.

B

Nor did Teixeira adequately plead a "class-of-one" Equal Protection Clause claim. A class-of-one claim is cognizable when a "plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). But Teixeira himself acknowledges that gun stores are materially different from other retail businesses when he notes that "[b]usinesses offering gun smithing services and retail firearm sales are strictly licensed and regulated by state and federal law." In neglecting to identify a similarly situated business, Teixeira failed to plead a cognizable class-of-one claim. Teixeira's Equal Protection Clause claims accordingly fail.

III

Next Teixeira argues that he has sufficiently pled a claim that Alameda County's zoning ordinance violates the Second Amendment. Because the district court disposed of the case on the pleadings, we must assume the veracity of the factual allegations contained in Teixeira's complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

The Second Amendment states that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." In *District of Columbia v. Heller*, the Supreme Court held that the Amendment guarantees an individual right to possess firearms for traditionally lawful purposes, such as self-defense. *See* 554 U.S. 570, 574–626 (2008). The Court subsequently applied the right against the States via the Fourteenth Amendment in *McDonald v. City of Chicago*, 561 U.S. 742 (2010). *See also Caetano v. Massachusetts*, 136 S. Ct. 1027, 1027 (2016) (per curiam).[2] Though the Supreme Court has yet to "clarify the entire field" of Second Amendment jurisprudence, *Heller*, 554 U.S. at 635, it has established a broad framework for addressing challenges such as the one at hand. *See Jackson v. City & County of San*

---

[2] Teixeira brings his Second Amendment claims, in part, on behalf of his "actual and prospective customers." As vendors "have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function," *Craig v. Boren*, 429 U.S. 190, 195 (1976), Teixeira has standing to challenge the Ordinance.

*Francisco*, 746 F.3d 953, 959 (9th Cir. 2014).[3] In reviewing Alameda County's ordinance, we employ a two-step inquiry, which begins by asking whether a challenged law burdens conduct protected by the Second Amendment; if the answer is in the affirmative, we apply the appropriate level of scrutiny. *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013) (citing *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)); *see also Jackson*, 746 F.3d at 959–60.

A

Turning to the inquiry's first step, we must determine whether the commercial sale of firearms implicates the Second Amendment right to keep and to bear arms by reviewing the "historical understanding of the scope of the right." *Heller*, 554 U.S. at 625.

1

Teixeira ultimately bases his Second Amendment challenge on a purported right to purchase firearms—that is, a right to *acquire* weapons for self-defense. Though *Heller* did not recognize explicitly a right to purchase or to sell weapons, the Court's opinion was not intended to serve as "an exhaustive historical analysis . . . of the full scope of the Second Amendment." *Heller*, 554 U.S. at 626. Therefore it is incumbent upon us to take a fresh look at the historical record to determine whether the right to keep and to bear arms, as

---

[3] Although the Supreme Court denied certiorari, at least two justices expressed concern with our analysis in *Jackson*. *See Jackson v. City & Cty. of San Francisco*, 135 S. Ct. 2799 (2015) (Thomas, J., dissenting from denial of certiorari).

understood at the time it was enshrined in the Constitution, embraced a right to acquire firearms. *See id.* at 634–35.

Our forefathers recognized that the prohibition of commerce in firearms worked to undermine the right to keep and to bear arms. *See generally* David B. Kopel, *Does the Second Amendment Protect Firearms Commerce?*, 127 Harv. L. Rev. F. 230 (2014). The English Bill of Rights of 1689 had guaranteed "[t]hat the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by law." 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441. The right of citizens to possess firearms was a proposition that necessarily extended from the fundamental tenet of natural law that a man had a right to defend himself. As William Blackstone noted:

> The fifth and last auxiliary right of the subject, that I shall at present mention, is that of having arms for their defence, suitable to their condition and degree, and such as are allowed by law. Which is also declared by the same statute I W. & M. st. 2. c. 2. and is indeed a public allowance, under due restrictions, of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression.

1 William Blackstone, *Commentaries* 139 (1765).

As British subjects, colonial Americans believed that they shared equally in the enjoyment of this guarantee, and that the right necessarily extended to commerce in firearms. Colonial law reflected such an understanding. For instance, in

Virginia, all persons had "liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony." Laws of Va., Feb., 1676–77, Va. Stat. at Large, 2 Hening 403. It came as a shock, therefore, when the Crown sought to embargo all imports of firearms and ammunition into the colonies. 5 Acts Privy Council 401, *reprinted in Connecticut Courant*, Dec. 19, 1774, at 3. The General Committee of South Carolina declared in response that "by the late prohibition of exporting arms and ammunition from England, it too clearly appears a design of disarming the people of America, in order the more speedily to dragoon and enslave them." 1 John Drayton, *Memoirs of the American Revolution As Relating to the State of South-Carolina* 166 (1821) (internal quotation marks omitted). Such suspicions were not unwarranted. As war raged in 1777, Colonial Undersecretary William Knox recommended that the Americans, once conquered, be subdued, in part, by prohibiting their means of producing arms: "the Arms of all the People should be taken away . . . nor should any Foundery or manufactuary of Arms, Gunpowder, or Warlike Stores, be ever suffered in America, nor should any Gunpowder, Lead, Arms or Ordnance be imported into it without Licence." Leland J. Bellot ed., *William Knox Asks What is Fit to Be Done with America?*, *in* 1 *Sources of American Independence* 140, 176 (Howard H. Peckham ed., 1978).

Knox never had the opportunity to put his plan into action. Having freed themselves from the rule of King George III, Americans turned their attention to fashioning a constitutional order that would preserve the rights they had shed blood defending at Lexington and Concord, Trenton, and Yorktown.

In ratifying the Second Amendment, the States sought to codify the English right to keep and to bear arms. *See Heller*, 554 U.S. at 599. The historical record indicates that Americans continued to believe that such right included the freedom to purchase and to sell weapons. In 1793, Thomas Jefferson noted that "[o]ur citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them." Thomas Jefferson, 3 *Writings* 558 (H.A. Washington ed., 1853). Indeed, as one commentator of the early Republic pondered, "What law forbids the veriest pauper, if he can raise a sum sufficient for the purchase of it, from mounting his Gun on his Chimney Piece . . . ?" *Heller*, 554 U.S. at 583 n.7 (quoting *Some Considerations on the Game Laws* 54 (1796)). At the time the Fourteenth Amendment was ratified, which *McDonald* held applied the Second Amendment against the States, at least some American jurists simply assumed that the "right to keep arms, necessarily involve[d] the right to purchase them." *Andrews v. State*, 50 Tenn. 165, 178 (1871).

As our predecessors recognized, logic compels such an inference. If "the right of the people to keep and bear arms" is to have any force, the people must have a right to acquire the very firearms they are entitled to keep and to bear. Indeed, where a right depends on subsidiary activity, it would make little sense if the right did not extend, at least partly, to such activity as well. The Supreme Court recognized this principle in very different contexts when it held that "[l]imiting the distribution of nonprescription contraceptives to licensed pharmacists clearly imposes a significant burden on the right of the individuals to use contraceptives," *Carey v. Population Servs., Int'l*, 431 U.S. 678, 689 (1977), and when it held that a tax on paper and ink products used by newspapers violated the First Amendment because it

impermissibly burdened freedom of the press, *see Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983). "[F]undamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined" because such "unarticulated rights are implicit in enumerated guarantees." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579–80 (1980). One cannot truly enjoy a constitutionally protected right when the State is permitted to snuff out the means by which he exercises it; one cannot keep arms when the State prevents him from purchasing them. *Cf. Jackson*, 746 F.3d at 967 ("[W]ithout bullets, the right to bear arms would be meaningless."); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to . . . maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."). Thus, the Second Amendment "right must also include the right to *acquire* a firearm." *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014).[4] As the District Court for the Northern District of Illinois noted in striking down a Chicago ordinance that abridged such right, a "ban on gun sales and transfers prevents [citizens] from fulfilling . . . the *most fundamental* prerequisite of legal gun ownership—that of simple acquisition." *Id.* at 938; *see also Mance v. Holder*, 74 F. Supp. 3d 795, 807 n.8 (N.D. Tex. 2015) ("[O]perating a business that provides Second

---

[4] History and logic aside, our Second Amendment jurisprudence compels such a conclusion. In *Jackson* we held that the Second Amendment protects the sale of ammunition. *See Jackson*, 746 F.3d at 968. It would be truly bizarre if the Second Amendment did not extend similarly to the sale of firearms.

Amendment services is generally protected by the Second Amendment, and prohibitions on firearms sales are subject to similar scrutiny."); *Radich v. Guerrero*, No. 1:14-CV-00020, 2016 WL 1212437, at *7 (D. N. Mar. I. Mar. 28, 2016) ("If the Second Amendment individual right to keep and bear a handgun for self-defense is to have any meaning, it must protect an eligible individual's right to purchase a handgun, as well as the complimentary right to sell handguns.").

Alameda County has offered nothing to undermine our conclusion that the right to purchase and to sell firearms is part and parcel of the historically recognized right to keep and to bear arms.

### 2

In addition to selling firearms, Teixeira alleges in his First Amended Complaint that his proposed gun store would offer various services including "state-mandated Hunter Safety Classes, Handgun Safety Certificates" and "classes in gun safety, including safe storage of firearms in accordance with state law." Because the Second Amendment protects a "right not as connected to militia service, but as securing the militia by ensuring a populace familiar with arms," *Heller*, 554 U.S. at 617, it naturally follows that

> to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use; in other words, it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order.

*Id.* at 617–18 (quoting Thomas Cooley, *The General Principles of Constitutional Law in the United States of America* 271 (1868)).

Such logic led the Seventh Circuit to conclude that a regulation prohibiting most firearm ranges within the city limits of Chicago constituted a "serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Ezell*, 651 F.3d at 708. Just like the firearm range in *Ezell*, the services Teixeira hopes to offer implicate the right to keep and to bear arms. The Ordinance's potential interference with such services was therefore a proper basis for Teixeira's Second Amendment challenge. *See Mance*, 74 F. Supp. 3d at 807 n.8.

### B

Having determined that, contrary to the district court's ruling, the Alameda County ordinance burdens conduct protected by the Second Amendment, the next step in the inquiry is to identify the proper standard of review. *Jackson*, 746 F.3d at 960–61; *Chovan*, 735 F.3d at 1136.

### 1

Though we typically subject a regulation interfering with a constitutionally protected right to some form of heightened scrutiny and require the Government to justify the burden it has placed on such right, the *Heller* court made clear that certain regulations enjoy more deferential treatment:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the

> possession of firearms by felons and the
> mentally ill, or laws forbidding the carrying of
> firearms in sensitive places such as schools
> and government buildings, or laws imposing
> conditions and qualifications on the
> commercial sale of arms.

*Heller*, 554 U.S. at 626–27. The Court went on to explain in a footnote that this list of "presumptively lawful regulatory measures" was not intended to be exhaustive. *Id.* at 627 n.26. *McDonald v. City of Chicago*, which incorporated the Second Amendment against the States, made similar assurances regarding such "longstanding regulatory measures." 561 U.S. at 786.

Teixeira argues that the passage in *Heller* is merely a prediction by the Court that such regulations would likely survive if subjected to some form of heightened scrutiny—it did not exempt listed activities from the analysis altogether. A dismissal of the language as dicta, however, is something we have considered previously and rejected. *See United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010). We instead treat *Heller*'s "presumptively lawful regulatory measures" as examples of prohibitions that simply "fall outside the historical scope of the Second Amendment." *Jackson*, 746 F.3d at 959–60. Given their longstanding acceptance, such measures are not subjected to the more exacting scrutiny normally applied when reviewing a regulation that burdens a fundamental right.

But an exemption for certain "laws imposing conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 626–27, does not mean that there is a categorical exception from Second Amendment scrutiny for the

regulation of gun stores. If such were the case, the County could enact a total prohibition on the commercial sale of firearms. There is no question that "[s]uch a result would be untenable under *Heller*." *Marzzarella*, 614 F.3d at 92 n.8. Indeed, if all regulations relating to the commercial sale of firearms were exempt from heightened scrutiny, there would have been no need to specify that certain "conditions and qualifications on the commercial sale of arms" were "presumptively lawful." *Heller*, 554 U.S. at 626–27 & n.26; *see* Kopel, *supra*, at 236 ("[T]he exception proves the rule. There is a right to the commercial sale of arms, but it is a right that may be regulated by 'conditions and qualifications.'"). As discussed, *supra*, we are satisfied that the historical right that the Second Amendment enshrined embraces the purchase and sale of firearms. The proper question, therefore, is whether Alameda County's ordinance is the type of longstanding "condition[]" or "qualification[] on the commercial sale of arms," *Heller*, 554 U.S. at 626–27, whose interference with the right to keep and to bear arms historically would have been tolerated.

In *United States v. Chovan*, we held that a federal statute prohibiting domestic violence misdemeanants from possessing firearms for life was not presumptively lawful under *Heller*. *See* 735 F.3d at 1137. First, we determined that the statute did not represent a "longstanding" prohibition, noting that the "first federal firearm restrictions regarding violent offenders were not passed until 1938." *Id.* Second, we concluded that the Government failed to prove "that domestic violence midemeanants in particular have historically been restricted from bearing arms." *Id.* (emphasis omitted). Thus, a regulation that merely resembles something listed by the Court in *Heller* will not avoid heightened constitutional scrutiny. Instead, the type of law in question must be both

longstanding and closely match a listed prohibition, *see id.*, or, alternatively, there must be "persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment," *Jackson*, 746 F.3d at 960. The burden is on the Government to demonstrate that a prohibition has historically fallen outside the Second Amendment's scope before it can claim a presumption of validity. *See Chovan*, 735 F.3d at 1137.

Here, the County failed to demonstrate that the Ordinance "falls within a well-defined and narrowly limited category of prohibitions that have been historically unprotected." *Jackson*, 746 F.3d at 960 (internal quotation marks omitted). Although, as the district court observed, the Ordinance is a "law[] imposing conditions and qualifications on the commercial sale of arms," (quoting *Heller*, 554 U.S. at 626–27), there has been no showing that it is "longstanding." *See Chovan*, 735 F.3d at 1137. Of course, that is not to say that the Ordinance itself had to have been on the books at the time the Second Amendment "codified a right 'inherited from our English ancestors,'" *Heller*, 554 U.S. at 599 (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)), in order to be presumed lawful. But the County has failed to advance any argument that the zoning ordinance is a type of regulation that Americans at the time of the adoption of the Second Amendment or the Fourteenth Amendment (when the right was applied against the States) would have recognized as a permissible infringement of the traditional right. While founding-era laws may have regulated where firearms could be discharged and where gunpowder could be stored, *id.* at 632, the County has not demonstrated that any historical regulation restricted where firearm sales could occur. That the Nation's first comprehensive zoning law did not come into

existence until 1916, *see* Sonia A. Hirt, *Zoned in the USA: The Origins and Implications of American Land-Use Regulation* 35 (2014), while not dispositive, provides at least some evidence that Alameda County's Conditional Use Permit requirement is not heir to a longstanding class of historical prohibitions or regulations. *See also Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 387 (1926) ("Building zone laws are of modern origin. They began in this country about 25 years ago.").[5] In any event, the County has failed to demonstrate that the Ordinance is the type of longstanding regulation that our predecessors considered an acceptable intrusion into the Second Amendment right. *See Jackson*, 746 F.3d at 960. Such burden was the County's to carry. *See Chovan*, 735 F.3d at 1137.

But such reasoning does not signify that the Ordinance violates the Second Amendment. It does mean, however, that the Ordinance must be subjected to heightened scrutiny—something beyond mere rational basis review, for, as the *Heller* Court noted, "If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." *Heller*, 554 U.S. at 628–29 & n.27.

---

[5] Of course, even if a zoning ordinance does not represent a longstanding prohibition or regulation, it may ultimately survive Second Amendment scrutiny as "sensible zoning and other appropriately tailored regulations" for gun-related activities are most certainly permissible. *See Ezell*, 651 F.3d at 709.

2

Though neither *Heller* nor *McDonald* dictates a specific standard of scrutiny for Second Amendment challenges, *see Heller*, 554 U.S. at 628–29, "[b]oth *Heller* and *McDonald* suggest that First Amendment analogues are more appropriate," *Ezell*, 651 F.3d at 706, as does our own jurisprudence, *see Jackson*, 746 F.3d at 960–61. "When ascertaining the appropriate level of scrutiny, 'just as in the First Amendment context,' we consider: '(1) how close the law comes to the core of the Second Amendment right and (2) the severity of the law's burden on the right.'" *Id.* (quoting *Chovan*, 735 F.3d at 1138); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev. 1443, 1461–73 (2009).

a

"[T]he Second Amendment has 'the core lawful purpose of self-defense,'" *Jackson*, 746 F.3d at 961 (quoting *Heller*, 554 U.S. at 630)—"'the right of a law-abiding, responsible citizen to possess and carry a weapon,'" *Chovan*, 735 F.3d at 1138 (quoting *Chester*, 628 F.3d at 682–83) (emphasis omitted). The first step in selecting an appropriate level of scrutiny is to determine how close the Alameda County ordinance comes to burdening such right.

In *Chovan*, we determined that a federal statute forbidding domestic violence midemeanants from possessing firearms did not implicate the core Second Amendment right because, by definition, misdemeanants were not "'law-abiding, responsible citizens.'" *Id.* at 1138 (quoting *Heller*, 554 U.S. at 635). In contrast, in *Jackson* we determined that a city ordinance requiring gun owners to store firearms in

locked containers in their homes did strike close to the core of the Second Amendment right because it made accessing weapons for self-defense more difficult. *See Jackson*, 746 F.3d at 963–64. Finally, in *Ezell*, the Seventh Circuit held that a regulation prohibiting most firearm ranges within the city limits of Chicago constituted a "serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Ezell*, 651 F.3d at 708.

Here, there is no question that an ordinance restricting the commercial sale of firearms would burden "the right of a law-abiding, responsible citizen to possess and carry a weapon," *Chovan*, 735 F.3d at 1138 (internal quotation marks omitted) (emphasis omitted), because it would inhibit his ability to acquire weapons.[6] We are therefore satisfied that such a regulation comes close to the core of the Second Amendment right.

b

Having determined that a law such as Alameda County's ordinance burdens protected conduct, we must next determine the severity of such burden. *See Jackson*, 746 F.3d at 960–61.

The County argues that the Ordinance "simply restricts the location of gun stores." If such is the case, the Ordinance

---

[6] As Teixeira observes, his future customers necessarily would be "law-abiding" because state and federal laws require that gun retailers perform background checks to confirm that customers are not criminals. Furthermore, as Teixeira argued in his First Amended Complaint, current law requires that gun owners receive training and certifications, which his business would provide.

"does not impose the sort of severe burden imposed by the handgun ban at issue in *Heller* that rendered it unconstitutional" because the Ordinance "does not substantially prevent law-abiding citizens from using firearms to defend themselves in the home." *Jackson*, 746 F.3d at 964. If the district court's assumption is indeed correct—that the Ordinance merely regulates where gun stores can be located rather than banning them—it burdens only the "*manner* in which persons may exercise their Second Amendment rights." *Chovan*, 735 F.3d at 1138. It is thus analogous to "a content-neutral speech restriction that regulates only the time, place, or manner of speech." *Jackson*, 746 F.3d at 964. To put it another way, the Ordinance would be a regulation rather than a prohibition. Though the Ordinance might implicate "the core of the Second Amendment right, [if] it does not impose a substantial burden on conduct protected by the Second Amendment," intermediate scrutiny would be appropriate. *Id.* at 965. *But see Mance*, 74 F. Supp. 3d 795, 807 ("Restricting the distribution channels of [firearms] to a small fraction of the total number of possible retail outlets requires a compelling interest that is narrowly tailored.").

Teixeira's First Amended Complaint, however, alleges that Alameda County has enacted something beyond a mere regulation—Teixeira alleges that the Conditional Use Permit's 500-foot rule, as applied, amounts to a complete ban on gun stores: "according to the plaintiffs' research, which is based primarily on government agency data, there are no parcels in the unincorporated areas of Alameda County which would be available for firearm retail sales." The district court disregarded such assertion, observing that other retail establishments selling guns exist in Alameda County and "plaintiffs [fail to] allege that the 'existing retail establishments' that sell guns are unable to comply with the

Ordinance." Perhaps anticipating the district court's skepticism, Teixeira's complaint alleged that other Federal Firearm Licensees located within the County were either not in fact retailers, or for whatever reason were not required to comply with the restrictions mandated by the Ordinance. Though such an assertion may yet prove false, there is no way to tell that from the face of the complaint. *See New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1094 (9th Cir. 2011). And if Teixeira had been given a chance to demonstrate that the Ordinance was "not merely regulatory," but rather functioned as a total ban on all new gun retailers, "a more rigorous showing" than even intermediate scrutiny, "if not quite 'strict scrutiny,'" would have been warranted. *Ezell*, 651 F.3d at 708.

C

Having determined that the Second Amendment compels us to apply some form of heightened scrutiny to a regulation that would significantly burden the commercial sale of firearms, we must finally examine the district court's disposition of Teixeira's claims.

1

Because Teixeira alleges here that the Ordinance's 500-foot requirement is unconstitutional on its face, we assume that the Ordinance merely regulates the location of gun stores and thus intermediate scrutiny applies. "Although courts have used various terminology to describe the intermediate scrutiny standard, all forms of the standard require (1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged

regulation and the asserted objective." *Chovan*, 735 F.3d at 1139.

The district court erroneously believed that the Ordinance fell outside the scope of the Second Amendment and thus warranted no more than rational basis review. The court nevertheless went through the motions of applying heightened scrutiny, contending that "the Ordinance would pass any applicable level of scrutiny." In analyzing step one, the court listed the "important governmental objectives" identified by the County: (1) "an 'interest in protecting public safety and preventing harm in populated, well-traveled, and sensitive areas such as residentially-zoned districts,'" (2) "'protecting against the potential secondary effects of gun stores'" and (3) "'preserving the character of residential zones.'"

The district court's characterization of "residentially-zoned districts" as "sensitive areas" is incongruous with *Heller*, which assumed that firearms could be restricted in sensitive places "such as schools and government buildings," *specifically in contrast to residences*, where firearms could *not* be prohibited. *See Heller*, 554 U.S. at 626–28. Of course, reducing violent crime is without question a substantial interest, *see Fyock v. Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015), assuming that the "secondary effects" to which the district court referred have something to do with crime.[7]

---

[7] Before the district court, the County argued that it was "reasonable to keep gun stores away from residentially-zoned districts simply because gun stores are heavily regulated, their patrons are heavily regulated, their owners are heavily regulated, and exactly the type of person should not be in a gun store can be—can be attracted to that area so there is secondary effect. And it is public safety to keep them away from the (inaudible) but it is a part of the burden of (inaudible)." It is difficult to understand why

Preserving the appearance of a neighborhood may also be characterized fairly as a substantial interest; on a previous occasion we held that Honolulu had "a substantial interest in protecting the aesthetic appearance of [its] communities by avoiding visual clutter" caused by "unsightly vendor stands." *One World One Family Now v. City & County of Honolulu*, 76 F.3d 1009, 1013 (9th Cir. 1996) (internal quotation marks omitted). The district court thus properly identified at least some interests that were "significant, substantial, or important." *Chovan*, 735 F.3d at 1139.

After identifying the County's purported interests, the district court then declared that there was a "reasonable fit between the Ordinance and its objectives." Here, the district court's analysis erred. It reasoned that "[w]hile keeping a gun store 500 feet away from a residential area does not guarantee that gun-related violence or crimes will not occur, the law does not require a perfect match between the Ordinance's means and objectives, nor does the law require the Ordinance to be foolproof." The problem is that the district court failed to explain how a gun store would increase crime in its vicinity. The court instead simply accepted the County's assertion without exacting it to any scrutiny, in a fashion that more closely resembled rational basis review.

---

the County relies on the "secondary effects" doctrine. In the First Amendment context, the Supreme Court explained that "a city may not regulate the secondary effects of speech by suppressing the speech itself," even if reducing speech would eliminate its undesired effects. *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 445 (2002). Following *Heller* and *McDonald*, it is doubtful that an ordinance whose true "purpose and effect," *id.*, was to eliminate access to firearms for law-abiding citizens could survive scrutiny.

Under heightened scrutiny, the County "bears the burden of justifying its action." *Ezell*, 651 F.3d at 706. The County failed to satisfy its burden because it never justified the assertion that gun stores act as magnets for crime. Indeed, Teixeira took pains to remind the court that "all employees working at a gun store, and all clients/customers are required to be law-abiding citizens."

In upholding other gun regulations, we have not simply accepted government assertions at face value. In *Chovan*, we reviewed evidence presented by the Government in support of a statute forbidding domestic violence misdemeanants from owning firearms—specifically, a series of studies relied upon previously by the Seventh Circuit supporting the Government's assertion that "a high rate of domestic violence recidivism exists." *See id.* at 1140–41 (citing *United States v. Skoien*, 614 F.3d 638, 643–44 (7th Cir. 2010)). Likewise in *Jackson*, we required that San Francisco provide evidence to demonstrate that requiring handguns to be stored in locked containers was reasonably related to the objective of reducing handgun-related deaths:

> The record contains ample evidence that storing handguns in a locked container reduces the risk of both accidental and intentional handgun-related deaths, including suicide. Based on the evidence that locking firearms increases safety in a number of different respects, San Francisco has drawn a reasonable inference that mandating that guns be kept locked when not being carried will increase public safety and reduce firearm casualties. This evidence supports San Francisco's position that section 4512 is

> substantially related to its objective to reduce the risk of firearm injury and death in the home.

746 F.3d at 966; *cf. City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 437 (2002) ("[T]he city certainly bears the burden of providing evidence that supports a link between concentrations of adult operations and asserted secondary effects."). And in *Fyock*, we affirmed a denial of a preliminary injunction against a city's ban on large-capacity magazines because we were satisfied with the district court's determination that "pages of credible evidence, from study data to expert testimony to the opinions of Sunnyvale public officials, indicat[ed] that the Sunnyvale ordinance is substantially related to the compelling government interest in public safety." 779 F.3d at 1000.

The district court should have followed our approach in *Jackson*, *Chovan*, and *Fyock* and required at least some evidentiary showing that gun stores increase crime around their locations. Likewise, the record lacks any explanation as to how a gun store might negatively impact the aesthetics of a neighborhood. The district court simply did not bother to address how the Ordinance was related to such an interest. Although under intermediate scrutiny the district court was not required to "impose 'an unnecessarily rigid burden of proof,'" the court should have at least required the County to demonstrate that it "reasonably believed [the evidence upon which it relied was] relevant to the problem that the [Ordinance] addresses.'" *Jackson*, 746 F.3d at 965 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50–52

(1986)).**⁸** The burden was on the County to demonstrate that there was "a reasonable fit between the challenged regulation and the asserted objective." *Chovan*, 735 F.3d at 1139. The County failed to carry such burden.

### 2

Teixeira also claims that the Ordinance, as applied, effects a complete ban on gun stores in unincorporated Alameda County.

In an attempt to further its conclusion that the 500-foot rule was reasonably tailored, the district court explained that the Ordinance "merely regulates the places where gun stores may be located . . . but it does not ban them" and "reasonable locations to operate a gun store in Alameda County exist, as evidenced by the many stores that sell guns there." As discussed, *supra*, Teixeira's First Amendment Complaint

---

**⁸** Certain facts alleged in the First Amended Complaint cast doubt on the County's contention that enforcement of the Ordinance was designed to satisfy the objectives it articulated in court. According to the complaint, the West County Board of Zoning Adjustments initially granted the Conditional Use Permit and variance after a staff report reached, among other findings, the conclusion that Valley Guns & Ammo would not "materially affect adversely the health or safety of persons residing or working in the vicinity." The variance and permit were denied instead because the San Lorenzo Village Homes Association, objecting to the proposed business, filed an appeal challenging the County's approval. In the First Amendment context, we condemned a "sensitive use veto" in *Young v. City of Simi Valley*, 216 F.3d 807, 814 & n.8 (9th Cir. 2000), because of the potential for third parties to invoke it arbitrarily. Of course, the residents who appealed the Zoning Board's approval may have done so for valid reasons other than "hostil[ity] to the civil rights of the plaintiffs as guaranteed by the Second and Fourteenth Amendments," as Teixeira alleges.

contends otherwise: "there are no parcels in the unincorporated areas of Alameda County which would be available for firearm retail sales." Though such an assertion may yet prove false, the district court could not simply assume so on a motion to dismiss. *See Iqbal*, 556 U.S. at 679 ("When there are well-pleaded factual allegations, a court should assume their veracity."). If on remand evidence does confirm that the Ordinance, as applied, completely bans new gun stores (rather than merely regulates their locations), something more exacting than intermediate scrutiny will be warranted. *See Ezell*, 651 F.3d at 708.

## IV

The dissent does not share our concern over Alameda County's attempt to restrict the ability of law-abiding Americans to participate in activity protected by the Second Amendment. According to the dissent, there is no constitutional infirmity so long as firearm sales are permitted somewhere in the County. We doubt the dissent would afford challenges invoking other fundamental rights such cursory review. Would a claim challenging an Alameda County ordinance that targeted bookstores be nothing more than "a mundane zoning dispute dressed up as a [First] Amendment challenge"? *See* Dissent at 35. Surely the residents of Alameda County could acquire their literature at other establishments that, for whatever reason, had not been shuttered by the law.

Such an ordinance, of course, would give us great pause. Our reaction ought to be no different when it comes to challenges invoking the Second Amendment. *See Ezell*, 651 F.3d at 697. The right of law-abiding citizens to keep and to bear arms is not a "second-class right, subject to an entirely

different body of rules than the other Bill of Rights guarantees that we have held to be incorporated into the Due Process Clause." *McDonald*, 561 U.S. at 780. Indeed, it is one "that the Framers and ratifiers of the Fourteenth Amendment counted . . . among those fundamental rights necessary to our system of ordered liberty." *Id.* at 778. Just as we have a duty to treat with suspicion governmental encroachments on the right of citizens to engage in political speech or to practice their religion, we must exert equal diligence in ensuring that the right of the people to keep and to bear arms is not undermined by hostile regulatory measures.

We reiterate *Heller* and *McDonald*'s assurances that government enjoys substantial leeway under the Second Amendment to regulate the commercial sale of firearms. *See id.* at 786; *Heller*, 554 U.S. at 626–27. Alameda County's Ordinance may very well be permissible. Thus far, however, the County has failed to justify the burden it has placed on the right of law-abiding citizens to purchase guns. The Second Amendment requires something more rigorous than the unsubstantiated assertions offered to the district court. Consequently, we reverse the dismissal of Teixeira's well-pled Second Amendment claims and remand for the district court to subject Alameda County's 500-foot rule to the proper level of scrutiny.

V

For the forgoing reasons, the dismissal of the Equal Protection Clause claims is **AFFIRMED** and the dismissal of the Second Amendment claims is **REVERSED**. The case is **REMANDED** for further proceedings consistent with this opinion. Each party shall bear its own costs on appeal.

SILVERMAN, Circuit Judge, concurring in part and dissenting in part:

The first thing you need to know about this case is who the plaintiffs are. They are *not* individuals who claim the right to keep and bear arms for self-defense or for other lawful purposes. Rather, they are entrepreneurs (and their supporters) who want to operate a gun shop in an area of Alameda County that is not zoned for that use.

The next thing you need to know is that there is no claim that, due to the zoning ordinance in question, individuals cannot lawfully buy guns in Alameda County. It is undisputed that they *can*. The record shows that there are at least ten gun stores already operating lawfully in Alameda County.

When you clear away all the smoke, what we're dealing with here is a mundane zoning dispute dressed up as a Second Amendment challenge.

The Supreme Court has held that the Second Amendment confers an individual right to keep and bear arms. *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). Even assuming for the sake of discussion that merchants who want to sell guns commercially have standing to assert the personal, individual rights of wholly hypothetical would-be buyers – a dubious assumption, in my opinion – the first amended complaint does not explain *how* Alameda County's zoning ordinance, on its face or as applied, impairs any *actual* person's *individual* right to bear arms, no matter what level of scrutiny is applied. Instead, the first amended complaint alleges that would-be buyers are entitled to the enhanced customer service experience that plaintiffs could provide.

Now, I like good customer service as much as the next guy, but it is not a constitutional right. What's more, the Supreme Court specifically held in *Heller* that "nothing in our opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27.

Conspicuously missing from this lawsuit is any honest-to-God resident of Alameda County complaining that he or she cannot lawfully buy a gun nearby. The district court was right on target in dismissing the plaintiffs' zoning case for failure to state a Second Amendment claim, because the district court correctly ruled that the ordinance restricting the location of a gun store is "quite literally a 'law[] imposing conditions and qualifications on the commercial sale of arms . . . .'" Therefore, I respectfully dissent from that portion of the majority's opinion.[1]

---

[1] I agree with my colleagues that the district court correctly dismissed the equal protection claim, and I concur in the opinion to that extent.