No. 13-17132

JOHN TEIXEIRA, *et al.*,

Plaintiffs-Appellants,

v.

COUNTY OF ALAMEDA, *et al*.,

Defendants-Appellees.

On Appeal from the United States District Court
for the Northern District of California, Case No. 3:12-CV-03288-WHO
District Judge William H. Orrick, III

**BRIEF FOR AMICUS CURIAE BRADY CENTER
TO PREVENT GUN VIOLENCE IN SUPPORT OF APPELLEES'
PETITION FOR REHEARING EN BANC**

BRADY CENTER TO PREVENT GUN
VIOLENCE

Jonathan Lowy
Alla Lefkowitz
Avery Gardiner
Kelly Sampson
840 First Street, N.E. Suite 400
Washington, DC 20002
(202) 370-8104
jlowy@bradymail.org

HOGAN LOVELLS US LLP
Adam K. Levin
Kathryn Marshall Ali  (CA #
282042)
Anna M. Kelly
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5600
adam.levin@hoganlovells.com

Jasmeet K. Ahuja
1835 Market Street, 29th Floor
Philadelphia, PA 19103
(267) 675-4600
jasmeet.ahuja@hoganlovells.com

Counsel for *Amicus Curiae*

August 1, 2016

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the Brady Center to Prevent Gun Violence states that it has no parent corporations, nor has it issued shares or debt securities to the public.  The organization is not a subsidiary or affiliate of any publicly owned corporation and no publicly held corporation holds ten percent of its stock.

/s/ Kathryn Marshall Ali
Kathryn Marshall Ali

.

# TABLE OF CONTENTS

Page

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ........................................i

TABLE OF AUTHORITIES .................................................................. iii

CONSENT TO FILE ............................................................................vi

STATEMENT OF INTEREST OF *AMICUS CURIAE*.............................................1

INTRODUCTION .................................................................................2

ARGUMENT ......................................................................................4

    I.    THE ORDINANCE DOES NOT INTERFERE WITH
        PLAINTIFFS' SECOND AMENDMENT RIGHTS ................................4

    II.   THE PANEL'S DECISION IGNORES THE REALITY
        THAT GUNS ARE WIDELY AVAILABILE AND POSE
        A SIGNIFICANT PUBLIC HEALTH RISK ............................................8

CONCLUSION ..................................................................................12

CERTIFICATE OF COMPLIANCE ....................................................................15

# TABLE OF AUTHORITIES

Page(s)

CASES:

*Berman v. Parker*,
348 U.S. 26 (1954)........................................................................4, 5

*Day-Brite Lighting Inc. v. Missouri*,
342 U.S. 421 (1952)............................................................................6

*District of Columbia v. Heller*,
554 U.S. 570 (2008)..............................................1, 2, 4, 6, 12, 13

*Foti v. City of Menlo Park*,
146 F.3d 629 (9th Cir. 1998) ...........................................................4

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir.), *cert. denied*, 136 S. Ct. 447 (2015) ..............................3

*Frisby v. Schultz*,
487 U.S. 474 (1988)............................................................................4

*Justice v. Town of Cicero*,
827 F. Supp. 2d 835 (N.D. Ill. 2011)................................................3

*McDonald v. City of Chi.*,
561 U.S. 742(2010)..........................................................1, 2, 12, 13

*Nordyke v. King*,
681 F.3d 1041 (9th Cir. 2012) .........................................................3

*Peruta v. Cty. of San Diego*,
No. 10-56971, 2016 WL 3194315 (9th Cir. June 9, 2016) .............................1, 7

*Richards v. Prieto*,
782 F.3d 417 (9th Cir. 2015) ...........................................................1

*Schneider v. New Jersey*,
308 U.S. 147 (1939)............................................................................4

*Teixeira v. Cty. of Alameda*,
822 F.3d 1047 (9th Cir. 2016). .....................................................5, 7

**TABLE OF AUTHORITIES—Continued**

Page(s)

*United States v. Hayes*,
    555 U.S. 415 (2009) ............................................................1

*United States v. Masciandaro*,
    638 F.3d 458 (4th Cir. 2011) ...........................................13

STATUTES:

Alameda Cty., Cal. Code § 17.54.131 ......................................5

Carver, MN, City Code § 50.118(b)-(c) ...................................3

Columbia Heights, MN, City Code § 9.107(C)(21) ................3

Laurel, MD, Land Dev. Code § 20-7.8(o) ...............................3

OTHER AUTHORITIES:

City of Sunnyvale, Cal., Report No. 11-209, *2011-7071 Location and Operation of Firearm Sales Businesses (Study Issue)* (Sept. 27, 2011) ............................................................................7

David I. Swedler et al., *Firearm Prevalence and Homicides of Law Enforcement Officers in the United States*, 105 Am. J. of Pub. Health 2042 (2015) ...................................................11, 12

Douglas J. Weibe et al., *Homicide and Geographic Access to Gun Dealers in the United States*, 9 BMC Pub. Health 199 (2009)............................9

Gad Lubin et al., *Decrease in Suicide Rates After a Change of Policy Reducing Access to Firearms in Adolescents: A Naturalistic Epidemiological Study*, 40 Suicide & Life-Threatening Behav. 421 (2010) ............................................................................11

Jiaquan Xu et al., *Deaths: Final Data for 2013*,
    64 Nat'l Vital Statistics Reports (2016),
    http://www.cdc.gov/nchs/data/nvsr/nvsr64/nvsr64_02.pdf ...............12

Joaquin Palomino, *Gun Purchases Up Despite California's Strict Firearms Laws*, S.F. Chron. (Dec. 26, 2015) ......................9

Lisa M. Hepburn & David Hemenway, *Firearm Availability and Homicide: A Review of the Literature*, 9 Aggression & Violent Behav. 417 (2004) ............................................................................... 10

Margot Sanger-Katz, *Gun Deaths Are Mostly Suicides*, N.Y. Times (Oct. 8, 2015) ........................................................................ 10, 11

Matthew Miller et al., *Firearm Availability and Unintentional Firearm Deaths*, 33 Accident Analysis & Prevention 477 (July 2001) .......................................................................... 10

Matthew Miller et al., *Rates of Household Firearm Ownership and Homicide Across US Regions and States, 1988-1997*, 92 Am. J. of Pub. Health 1988 (2002) ...................................................... 10

Megan S. Knize, *Payday Lending in Louisiana, Mississippi, and Arkansas: Toward Effective Protections for Borrowers*, 69 La. L. Rev. 317 (2009) ...................................................................... 7, 8

Mira Rojanasakul & Blacki Migliozzi, *After Orlando, Gun Sales Surged*, Bloomberg (July 7, 2016) ......................................... 9

Violence Policy Ctr., *States with Weak Gun Laws and Higher Gun Ownership Lead Nation in Gun Deaths, New Data for 2014 Confirms* (Jan. 4, 2016) .................................................. 10

## CONSENT TO FILE

Pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, *amicus* received consent from all parties to file this brief.  No party or party's counsel authored this brief in whole or in part.  No party, party's counsel, or person other than *amicus*, its members, or its counsel contributed money intended to fund preparation and submission of this brief.

**STATEMENT OF INTEREST OF *AMICUS CURIAE***

*Amicus* Brady Center to Prevent Gun Violence (the "Brady Center") is a national, non-partisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy. Through its Legal Action Project, it has filed numerous *amicus curiae* briefs in cases involving firearms regulations. *See McDonald v. City of Chicago*, 561 U.S. 742, 870 n.13, 887 n.30, 891 n.34 (2010) (Stevens, J., dissenting) (citing Brady Center brief); *United States v. Hayes*, 555 U.S. 415, 427 (2009) (citing Brady Center brief); *District of Columbia v. Heller*, 554 U.S. 570 (2008); *Richards v. Prieto*, 782 F.3d 417 (9th Cir. 2015) (granting petition for rehearing en banc, where Brady Center filed an amicus brief); and *Peruta v. Cty. of San Diego*, No. 10-56971, 2016 WL 3194315 (9th Cir. June 9, 2016). The Brady Center has unique expertise in Second Amendment law and firearms policy issues, including 26 years of experience in gun litigation and analysis of firearms regulation. *Amicus* has a compelling interest in ensuring that lawful regulations governing the sale of arms are not, overnight, found to be unlawful, contrary to longstanding Supreme Court precedent and other historical analysis.

**INTRODUCTION**

A divided panel of this Court decided that a modest zoning ordinance restricting a gun store's location violated the Second Amendment. It does not. Not once, but twice, the Supreme Court has made clear that the Second Amendment allows for a wide gamut of laws and regulations, and has gone so far as to emphasize that, although the Second Amendment confers an individual right to possess handguns in the home for self-protection, that finding should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms," "laws forbidding the carrying of firearms in sensitive places," or "laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27; *see also McDonald*, 561 U.S. at 785. The Court even clarified that the short list of "presumptively lawful measures" it identified does not "purport to be exhaustive." *Heller*, 554 U.S. at 627 n.26. Brushing aside this unambiguous guidance, a panel of this Court broke new ground in finding that a benign zoning restriction—promulgated by Alameda County's constituents to secure the public needs of its community—contravenes Plaintiffs' Second Amendment rights. It does not because those rights are untouched by the ordinance.

The panel's decision warrants review because it raises issues of exceptional and recurring importance. For one, ordinances like Alameda County's are

commonplace across the country.[1]  Many communities wish to reasonably restrict

access to guns by regulating them through ordinance.  And federal court after

federal court has found such regulations to be lawful.  *See, e.g.*, *Friedman v. City*

*of Highland Park*, 784 F.3d 406, 412 (7th Cir.), *cert. denied*, 136 S. Ct. 447 (2015)

(upholding the city's ordinance that prohibits possession of assault weapons or

large-capacity magazines); *Nordyke v. King*, 681 F.3d 1041, 1044 (9th Cir. 2012)

(upholding Alameda County's ordinance which makes it a misdemeanor to bring a

firearm onto county property); *Justice v. Town of Cicero*, 827 F. Supp. 2d 835,

841-42 (N.D. Ill. 2011) (upholding an ordinance that required all firearms to be

registered and imposed a registration fee to do so).  This should be unsurprising, of

---

[1]  *See, e.g.*, Carver, MN, City Code § 50.118(b)-(c) ("The zoning lot
containing the firearm sales shall be at least 1,000 feet from the property line of a
site containing a pawnshop, Currency Exchange, payday loan agency, alcoholic
beverage sales or sexually-oriented business.  In the case of a shopping center or
multi-use structure, the distance shall be measured from the portion of the center or
structure occupied by the firearm sales.  The zoning lot containing the firearm sales
shall be located a minimum of 750 feet from the property line of any zoning lot or
parcel of land that is zoned residential, or has an educational (academic) use,
religious institution, park, library or community center.  In the case of a shopping
center or multi-use structure, the distance shall be measured from the portion of the
center or structure occupied by the use."); Columbia Heights, MN, City Code §
9.107(C)(21) ("No firearms or ammunition shall be displayed in window areas or
any area where they can be viewed from any public street or sidewalk."); Laurel,
MD, Land Dev. Code § 20-7.8(o) ("Gun shops subject to the following conditions:
(1) That sale of firearms of any type shall not be made to minors.
(2) That no gun shop shall be allowed within one hundred (100) yards of a park,
church, or school.").

course, because, like the ordinance at issue here, these regulations fall squarely within the *identified* regulations the Supreme Court has held to be presumptively lawful: in this case, a "law[] imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27.

The panel's decision upends decades of Second Amendment jurisprudence by finding a Second Amendment claim where none actually exists and then jettisoning regulations that the highest court has already declared permissible. More alarming, the decision appears to have been made in a vacuum. Eyes wide shut to the reality that guns are readily available in Alameda County, like the rest of the United States, the panel overlooks that those law-abiding persons who wish to purchase guns have every ability to do so. En banc review should be granted.

## ARGUMENT

## I.     THE ORDINANCE DOES NOT INTERFERE WITH PLAINTIFFS' SECOND AMENDMENT RIGHTS

The people are the "main guardian" of public welfare. *Berman v. Parker*, 348 U.S. 26, 32 (1954).[2] "It is within the power of the legislature to determine that

---

[2]     *See also Frisby v. Schultz*, 487 U.S. 474, 484 (1988) ("The State's interest in protecting the well-being [and] tranquility . . . of the home is certainly of the highest order.") (citation omitted); *Schneider v. New Jersey*, 308 U.S. 147, 160 (1939) ("[A] municipality may enact regulations in the interest of the public safety, health, welfare or convenience . . . ."); *Foti v. City of Menlo Park*, 146 F.3d 629, 637 (9th Cir. 1998) ("Cities do 'have a substantial interest in protecting the aesthetic appearance of their communities by avoiding visual clutter . . . [and] in assuring safe and convenient circulation on their streets.'") (alterations in original;

the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled." *Id.* at 33.  This is because the values intrinsic to public welfare are many: they are "spiritual," "physical," "aesthetic," and "monetary."  *Id.*  It is not only a right but a responsibility of the community to decide what is appropriate for itself in terms of public safety, public health, and morality, and then to regulate accordingly.  The only check is that they be "[s]ubject to *specific* constitutional limitations."  *Id*. at 32 (emphasis added).

Despite the panel's searching review otherwise, no constitutional limitations can be found in this case.  Alameda County's Zoning Ordinance (the "Ordinance") seeks to ensure only that no conditional use permits for gun shops be granted if the subject premises were located within 500 feet of any of the following: "Residentially zoned district[s]; elementary, middle or high school[s]; pre-school or day care center[s]; other firearms sales business[es]; or liquor stores or establishments in which liquor is served."  Alameda Cty., Cal. Code § 17.54.131. Even assuming that the majority is correct that the Second Amendment confers a right "to purchase or to sell weapons"—which, to be sure, *amicus* does not believe it does—that does not mean that there is a right to buy and sell in every County.  In any event, the Ordinance neither bans gun shops nor keeps gun shops out of the County.  *Teixeira v. Cty. of Alameda*, 822 F.3d 1047, 1054 (9th Cir. 2016).

citation omitted).

5

Glaringly omitted from the panel's majority decision is the fact "that there are at least ten gun stores already operating lawfully in Alameda County" alone. *Id*. at 1064 (Silverman, J., concurring in part and dissenting in part). There is therefore no legitimate concern that guns cannot be purchased in Alameda County: they most certainly can and they most certainly are.[3]

The only question remaining then is whether the Second Amendment grants a categorical right to sell weapons at one's chosen location. To this, the answer is a deafening no. In finding that the Second Amendment provides an individual right to possess handguns in the home for self-protection, the Supreme Court bent over backwards to explain that the right is not "unlimited." *Heller*, 554 U.S. at 626. The ruling expressly did not displace "longstanding" regulations. *Id*. To the extent that the Court narrowed a community's ability to regulate firearms, the Court certainly did not deprive communities of their authority to determine where certain stores should be located. The reason for this is long-established. Because it is the community that is ultimately responsible for protecting "the health and morals of the citizen[s]," it is therefore incumbent upon the community to design what their community will look like and what will be restricted. *Day-Brite Lighting Inc. v. Missouri*, 342 U.S. 421, 423 (1952). Notwithstanding the majority's pretense otherwise, gun shops are aesthetically different from

---

[3]     *See infra* Part II.

bookstores and carry very different public safety, public health, and morality concerns. *Cf. Peruta*, 2016 WL 3194315, at \*20 (Graber, J., concurring) ("[L]ocalizing the decision allows more careful and accurate consideration of each individual's license application. California entrusts the decision-making responsibility to local law enforcement officials because they are best positioned to evaluate the potential dangers that increasing or decreasing concealed carry would have in their communities."). A zoning ordinance that simply regulates the location of such shops thus raises no constitutional concerns.

Communities regulate the location of gun stores for myriad reasons. Some worry about a decrease in nearby property values. Others stress the negative influence gun shops may have on children who pass by. While others fear that "[t]hey create insecurity for nearby residents about their safety." *See, e.g.*, City of Sunnyvale, Cal., Report No. 11-209, *2011-7071 Location and Operation of Firearm Sales Businesses (Study Issue)* 6 (Sept. 27, 2011).[4] The panel majority faults Alameda County for failing to make an "evidentiary showing that gun stores increase crime around their locations" or "negatively impact the aesthetics of a neighborhood." *Teixeira*, 822 F.3d at 1062. But the proof is out in the open. There is a reason that payday lenders, which bankrupt individuals, specifically target communities where there are "pawn shops," "minority neighborhoods," and

_____

[4]    *See* http://sunnyvale.ca.gov/Portals/0/Sunnyvale/CouncilReports/2011/11-209.pdf.

"gun stores." Megan S. Knize, *Payday Lending in Louisiana, Mississippi, and Arkansas: Toward Effective Protections for Borrowers*, 69 La. L. Rev. 317, 325 (2009). The County was entitled to conclude that gun stores come with certain public health effects and may be considered aesthetically displeasing. That is why community after community regulates gun store locations to the degree they do.

It is the community that retains the power to decide what it should look like and how it should be designed. Alameda County appropriately exercised that right and implemented a reasonable and presumptively valid restriction. The Second Amendment has no place in that conversation because the protections afforded by the Second Amendment are not implicated.

II.     THE PANEL'S DECISION IGNORES THE REALITY THAT GUNS ARE WIDELY AVAILABLE AND POSE A SIGNIFICANT PUBLIC HEALTH RISK

The panel also has raised a question of exceptional importance by substantially—and improperly—enlarging the Second Amendment to encompass a broad right to sell and purchase weapons. The panel's preoccupation with Plaintiffs' needs to be entrepreneurs seemingly trumps every other consideration. Missing from the panel's decision is any discussion of the role of guns in society and the reality that guns are readily available. Leaving aside the succinct legal rationale for granting en banc review, these serious public policy reasons on their own warrant en banc review.

1. As a starting matter, guns are readily available, including in California. Even as the State has enacted "some of the toughest gun laws in the country," California has witnessed a doubling in the sale of handguns between 2010 and 2014, according to California Department of Justice records. Joaquin Palomino, *Gun Purchases Up Despite California's Strict Firearms Laws*, S.F. Chron. (Dec. 26, 2015).[5] The San Bernardino terror attack of December 2015 only further spiked gun sales, with registrations in California increasing 900%. *Id.* Across the country, gun sales are steadily on the rise, with peaks after mass shootings. Mira Rojanasakul & Blacki Migliozzi, *After Orlando, Gun Sales Surged*, Bloomberg (July 7, 2016).[6]

2. At the same time, studies have found that high numbers of gun dealers are linked to increased homicide rates. *See, e.g.*, Douglas J. Weibe et al., *Homicide and Geographic Access to Gun Dealers in the United States*, 9 BMC Pub. Health 199, 204 (2009)[7] ("[H]aving a disproportionately high number of [federal firearm licensees] was associated with significantly higher rates of firearm homicide in major cities). High rates of gun ownership are also associated with higher risks of homicide. Lisa M. Hepburn & David Hemenway, *Firearm Availability and*

---

[5]    *See* http://www.sfchronicle.com/crime/article/Gun-purchases-up-despite-California-s-strict-6721957.php.

[6]    *See* http://www.bloomberg.com/graphics/2016-gun-sales/.

[7]    *See* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2714509/pdf/1471-2458-9-199.pdf .

*Homicide: A Review of the Literature*, 9 Aggression & Violent Behav. 417, 417 (2004) ("[H]ouseholds with firearms are at higher risk for homicide, and there is no net beneficial effect of firearm ownership."); Matthew Miller et al., *Rates of Household Firearm Ownership and Homicide Across US Regions and States, 1988-1997*, 92 Am. J. of Pub. Health 1988, 1988 (2002) ("[I]n areas where household firearm ownership rates were higher, a disproportionately large number of people died from homicide."); Matthew Miller et al., *Firearm Availability and Unintentional Firearm Deaths*, 33 Accident Analysis & Prevention 477, 477 (July 2001) ("A statistically significant and robust association exists between gun availability and unintentional firearm deaths.").  Social science also has shown that "[S]tates with weak gun violence prevention laws and higher rates of gun ownership have the highest overall gun death rates in the nation."  Violence Policy Ctr., *States with Weak Gun Laws and Higher Gun Ownership Lead Nation in Gun Deaths, New Data for 2014 Confirms* (Jan. 4, 2016).[8]

Tragically, social science also demonstrates that suicide rates track the availability of guns.  Margot Sanger-Katz, *Gun Deaths Are Mostly Suicides*, N.Y. Times (Oct. 8, 2015).[9]  "Studies suggest that suicide attempts often occur shortly after people decide to kill themselves, so people with deadly means at hand when

---

[8] *See* http://www.vpc.org/press/states-with-weak-gun-laws-and-higher-gun-ownership-lead-nation-in-gun-deaths-new-data-for-2014-confirms/.

[9] *See* http://mobile.nytimes.com/2015/10/09/upshot/gun-deaths-are-mostly-suicides.htm.

the impulse strikes are more likely to use them than those who have to wait or plan." *Id*.  In Israel, for instance, after the army stopped allowing soldiers to take home their service weapons over the weekends, the suicide rate fell by 40%.  Gad Lubin et al., *Decrease in Suicide Rates After a Change of Policy Reducing Access to Firearms in Adolescents: A Naturalistic Epidemiological Study*, 40 Suicide & Life-Threatening Behav. 421, 421 (2010).[10]

3.  Finally, high gun ownership rates dramatically increase the likelihood that law enforcement officers will be murdered in the line of duty.  As recent events in Dallas and Baton Rouge make painfully clear, law enforcement cannot ensure public safety where their own safety is put at risk by guns being in the wrong hands.  And researchers from the Harvard School of Public Health and elsewhere recently concluded that "[o]fficers in the high-gun [ownership] [S]tates had *3 times the likelihood* of being killed compared with low-gun [ownership] [S]tates."  David I. Swedler et al., *Firearm Prevalence and Homicides of Law Enforcement Officers in the United States*, 105 Am. J. of Pub. Health 2042, 2047 (2015).[11]  According to the researchers, "[t]he differences were large[,]" and "States [sh]ould consider methods for reducing firearm ownership as a way to reduce occupational deaths of [officers]." *Id*. at 2042, 2047.

4.  To be clear, not all of these social science insights regarding the risks

---

[10]    *See* http://www.gsoa.ch/media/medialibrary/2010/12/Lubin_10.pdf.
[11]    *See* http://ajph.aphapublications.org/doi/pdf/10.2105/AJPH.2015.302749.

of firearms are directly pertinent to support the County's zoning ordinance at issue here. However, these and other realities of guns in America should be considered before the Court embarks on expanding in any way the narrow Second Amendment right recognized in *Heller* and *McDonald*, or restricting the longstanding authority of communities to enact zoning ordinances such as this.

*       *       *

The panel mistakes the question that should be asked. It is not whether individuals have access to guns but whether they should have virtually unlimited access to guns. Or whether one store, let alone ten, adequately secures one's Second Amendment rights in a particular county.

The gun violence that kills 33,000 in America every year,[12] as well as the mass shootings in Dallas, Orlando, San Bernardino, and Charleston—to list only a recent few—should give the Court pause about why reasonable regulations exist and why they have been a part of the bedrock of our nation's relationship to guns.

## CONCLUSION

The panel's decision is not only wrong—it has lethal consequences. Where the decision contravenes Supreme Court precedent and disregards the reasoned judgment of Alameda County's elected representatives, rehearing is warranted. Leaving the panel's decision intact would severely expand what the Second

---

[12]    Jiaquan Xu et al., *Deaths: Final Data for 2013*, 64 Nat'l Vital Statistics Reports 10 (2016), http://www.cdc.gov/nchs/data/nvsr/nvsr64/nvsr64_02.pdf.

Amendment protects, far beyond that which our Framers designed or which the Supreme Court has held in *Heller* and *McDonald*. And as our daily news headlines poignantly demonstrate, it is simply not a mistake that we can afford to make. *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011) ("We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights."). En banc review should be granted.

Respectfully submitted,

  /s/ Kathryn Marshall Ali
Kathryn Marshall Ali (CA # 282042)

Adam K. Levin
Kathryn Marshall Ali
Anna M. Kelly
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5600
adam.levin@hoganlovells.com

Jasmeet K. Ahuja
1835 Market Street, 29th Floor
Philadelphia, PA 19103
(267) 675-4600
jasmeet.ahuja@hoganlovells.com

Jonathan Lowy
Alla Lefkowitz
Avery Gardiner
Kelly Sampson
840 First Street, N.E. Suite 400
Washington, DC 20002

(202) 370-8104

jlowy@bradymail.org

*Counsel for Amicus Curiae*

August 1, 2016

**CERTIFICATE OF COMPLIANCE**

I certify that, pursuant to 9th Circuit Rules 29-2, the attached petition for rehearing or rehearing en banc is proportionately spaced, has a typeface of 14 points, and does not exceed 15 pages.


/s/ Kathryn Marshall Ali
Kathryn Marshall Ali

| 9th Circuit Case Number(s) | 13-17132 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE

### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) 08/01/2016 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format)    /s/ Kathryn M. Ali

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE

### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)