No. 13-17132

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

JOHN TEIXEIRA; STEVE NOBRIGA; GARY GAMAZA; CALGUNS
FOUNDATION, INC. (CGF); SECOND AMENDMENT
FOUNDATION, INC. (SAF); CALIFORNIA ASSOCIATION OF
FEDERAL FIREARMS LICENSEES (CAL-FFL),
*Plaintiffs-Appellants,*

v.

COUNTY OF ALAMEDA; ALAMEDA COUNTY BOARD OF
SUPERVISORS, as a policy making body; WILMA CHAN, in
her official capacity; NATE MILEY, in his official
capacity; KEITH CARSON, in his official capacity,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of California

BRIEF *AMICI CURIAE* OF PROFS. RANDY BARNETT, ROBERT J.
COTTROL, BRANNON DENNING, MICHAEL O'SHEA, AND GLENN
HARLAN REYNOLDS, AND THE FIREARMS POLICY FOUNDATION
IN SUPPORT OF PLAINTIFFS-APPELLANTS

Eugene Volokh
405 Hilgard Ave.
Los Angeles, CA 90095
(310) 206-3926
eugene.volokh@gmail.com
*Counsel for Amici Curiae*

## Rule 26.1 Disclosure Statement

*Amicus Curiae* Firearms Policy Foundation, a nonprofit public benefit corporation organized under the laws of Delaware, has no parent companies, subsidiaries, or affiliates and does not issue shares to the public.

# Table of Contents

Rule 26.1 Disclosure Statement .................................................................. i

Table of Contents.................................................................................... ii

Table of Authorities ............................................................................... iii

Interest of *Amici Curiae* ......................................................................... 1

Summary of Argument ............................................................................. 2

    I.   Constitutional rights generally protect the right to acquire what is needed to exercise the rights. .......................................... 6

    II.  The power to regulate the sales of constitutionally protected goods and services does not include the power to prohibit them. ............................................................................................ 8

    III. Governments may not entirely ban the sale of constitutionally protected goods and services within their jurisdiction. ............................................................................... 10

    IV. Restrictions on constitutionally protected activity must be justified with real evidence, rather than bare speculation. ....... 14

Conclusion............................................................................................. 18

# Table of Authorities

## Cases

*Andrews v. State*, 50 Tenn. 165 (1871) ......................................................... 6

*Binderup v. U.S. Attorney General*, 836 F.3d 336 (3d Cir. 2016) (en banc) ................................................................. 15, 16

*Buckley v. Valeo*, 424 U.S. 1 (1976) ........................................................ 6, 9

*Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989) .................................................................. 7

*Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977) ......................... 6, 7, 9

*City of Dublin v. County of Alameda*, 14 Cal. App. 4th 264 (1993) .................................................................. 10

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) ............................................. 12

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986) ................................................................. 12, 15, 16

*D.C. v. Heller*, 554 U.S. 570 (2008) ............................................. 3, 8, 10, 16

*Doe v. Bolton*, 410 U.S. 179 (1973) ...................................................... 6, 7, 9

*Ezell v. City of Chicago (I),* 651 F.3d 684 (7th Cir. 2011) ................... 3, 12

*Ezell v. City of Chicago (II)*, Nos. 14-3312 & -3322 (7th Cir. Jan. 18, 2017), http://tinyurl.com/ezell-ii ............................... 13, 15

*Illinois Ass'n of Firearms Retailers v. City of Chicago, 961* F. Supp. 2d 928 (N.D. Ill. 2014) ................................................... 13

*Miller v. Blacketter*, 525 F.3d 890 (9th Cir. 2008) ..................................... 7

iii

*Randall v. Sorrell*, 548 U.S. 230 (2006) ..................................................... 10

*Schad v. Borough of Mt. Ephraim*, 452 U.S. 61 (1981)..................... passim

*Stirling v. Board of Supervisors*, 48 Cal. App. 3d 184
(1975)............................................................................................... 11

*Tyler v. Hillsdale County Sheriff's Dep't*, 837 F.3d 678
(6th Cir. 2016) (en banc) .................................................................. 16

*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006) ............................. 7

*Young v. American Mini Theatres, Inc.*, 427 U.S. 50
(1976)....................................................................................... 9, 15, 16

## Statutes

Cal. Penal Code § 26815(a)......................................................................... 17

## Other Authorities

Bureau of Alcohol, Tobacco, Firearms & Explosives,
*Firearms Trace Data – 2015 / Time-to-Crime –*
*Firearms Recovered and Traced in the United States*
*and Territories,* https://www.atf.gov/about/firearms-
trace-data-2015 & https://www.atf.gov/docs/finalttc-
cy2015xlsx/download............................................................................. 17

## Interest of *Amici Curiae*[1]

Profs. Randy Barnett (Georgetown University Law Center), Robert J. Cottrol (George Washington University Law School), Brannon Denning (Cumberland School of Law), Michael O'Shea (Oklahoma City University School of Law), and Glenn Harlan Reynolds (University of Tennessee College of Law) have written extensively on constitutional law generally and on the Second Amendment in particular. They believe that their perspective can help the Court evaluate this case.

Firearms Policy Foundation is a grassroots, 501(c)(3) nonprofit public benefit organization. The Foundation's mission is to defend the Constitution and the People's rights, privileges, and immunities that are deeply rooted in this Nation's history and tradition, especially the inalienable, fundamental, and individual right to keep and bear arms. In this case, the Foundation represents the interest of its members and the law-abiding public in preserving the constitutional protection that the panel opinion provided.

---

[1] No party or party's counsel has authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting the brief. No person except *amici* has contributed money that was intended to fund preparing or submitting the brief. All parties have given blanket consent to the filing of *amicus* briefs.

## Summary of Argument

The panel decision correctly applies standard, familiar, and uncontroversial constitutional rights principles to a slightly different context: the Second Amendment. The Court ought to reaffirm the result and reasoning that the panel decision applied.

1. As with other rights, the Second Amendment must protect conduct that people need to engage in to exercise their rights. The First Amendment protects not just the right to speak, but also the right to spend money to buy advertising space. Once the Supreme Court has recognized the rights to use contraceptives and get abortions, a state may not unduly interfere with people buying contraceptives, or obtaining abortions from a doctor. Likewise, the Second Amendment right to possess guns to defend oneself and one's family protects the right to buy such guns.

2. The power to regulate such behavior—behavior necessary for people to exercise their rights—does not include the power to ban the behavior. The First Amendment allows the government to impose certain content-neutral restrictions on, for instance, signs in residential areas, but not to totally ban such signs. Reproductive rights recognized by the

Supreme Court allow the government to regulate abortion clinics, but not to ban them. Likewise, the government's power to "impos[e] conditions and qualifications on the commercial sale of arms," *D.C. v. Heller*, 554 U.S. 570, 626-27 (2008), does not include the power to forbid gun stores altogether.

3. A government may not completely ban the provision of a constitutionally protected product or service within its jurisdiction. California law allows county governments to impose zoning conditions only on unincorporated areas within the county. Zoning in incorporated areas is within the jurisdiction of city governments, not the county government. Plaintiffs' complaint thus alleges that Alameda County's zoning rules categorically ban gun stores everywhere that Alameda County has the power to ban them. This would make those zoning rules just like the ban on live entertainment that the Supreme Court struck down under the First Amendment in *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61 (1981), and the ban on firing ranges that the Seventh Circuit struck down in *Ezell v. City of Chicago (I),* 651 F.3d 684 (7th Cir. 2011).

Nor does it matter whether the constitutionally protected product or service could be found in a neighboring jurisdiction (such as an incorpo-

rated area that is governed by city rules). What one jurisdiction can do, others can do, too. If Alameda County can ban gun stores within its jurisdiction, cities in Alameda County can ban gun stores within theirs, and neighboring counties can do the same.

Indeed, since gun restrictions, like other laws, are often the product of broader social movements, jurisdictions may well be inclined to follow their neighbors' lead. Thus, even when live entertainment or gun training or gun stores are available nearby at one time, they may no longer be available a few years later. Rather than letting the constitutionality of an ordinance ebb and flow depending on what neighboring jurisdictions do, complete bans should be treated as presumptively unconstitutional.

4. Finally, as with other rights, restrictions on Second Amendment rights must be founded on evidence, not mere hypothetical speculation. Regulations (but not total prohibitions) of the location of bookstores might, for instance, be permissible when the government has real evidence that the presence of the bookstores can cause harmful "secondary effects," such as by attracting people who will commit crimes at or near the bookstore.

Likewise, regulations of the location of gun stores might be permissible if the government has real evidence that the people who buy guns at those stores will commit crimes at or near the stores. *Amici* doubt that such evidence can be found: The overwhelming majority of people who buy guns at gun stores are law-abiding, and indeed must by law lack any serious criminal record.

Moreover, even the rare criminal gun store customer (especially one who, by California law, has to wait 10 days to receive his gun) is likely to buy the gun for future crimes, not those that would take place immediately outside the store. Customers of bars might be drunk right outside the bars. Viewers of pornographic films might seek to hire a prostitute right outside the theater. The occasional gun-buying criminals, on the other hand, do not generally look for opportunities to misuse their guns right outside the store.

But in any event, the government must at least show that there are indeed "secondary effects" that justify limits on a gun store's location. The government cannot just assume that such harmful effects exist, or casually analogize gun stores to pornographic bookstores as opposed to, say, ordinary nonpornographic bookstores.

5

## I.    Constitutional rights generally protect the right to acquire what is needed to exercise the rights.

The right of law-abiding Americans to own guns must include their right to buy guns. This is the way the Constitution treats other rights; gun rights should be treated the same way. *See, e.g.*, *Andrews v. State*, 50 Tenn. 165, 178 (1871) (concluding, under the Tennessee Constitution, that "[t]he right to keep arms, necessarily involves the right to purchase them").

Thus, for instance, the Supreme Court has recognized that restrictions on using money to buy advertising space presumptively violate the First Amendment, "because virtually every means of communicating ideas in today's mass society requires the expenditure of money." *Buckley v. Valeo*, 424 U.S. 1, 19 (1976). Likewise, "[r]estrictions on the distribution of contraceptives"—including commercial distribution—"clearly burden" the right, recognized by the Supreme Court, to exercise reproductive choice. *Carey v. Population Servs. Int'l*, 431 U.S. 678, 687 (1977). So do restrictions on which facilities may perform abortions. *Id.* at 688; *Doe v. Bolton*, 410 U.S. 179, 194-95 (1973). And restrictions on "the right to be represented by an otherwise qualified attorney whom

[a] defendant can afford to hire" would likewise violate the Sixth Amendment. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624-25 (1989) (noting and accepting the government's concession on this score); *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (likewise); *Miller v. Blacketter*, 525 F.3d 890, 895 (9th Cir. 2008) (citing *Caplin & Drysdale* for this proposition).

And that is true even when the government restricts—rather than totally bans—the provision of constitutionally protected goods and services, such as by limiting abortions to accredited hospitals, *Doe v. Bolton*, 410 U.S. at 194-95, or by "[l]imiting the distribution of nonprescription contraceptives to licensed pharmacists," *Carey*, 431 U.S. at 689. "[T]he restriction of distribution channels to a small fraction of the total number of possible retail outlets," the Court recognized, "renders contraceptive devices considerably less accessible to the public, reduces the opportunity for privacy of selection and purchase, and lessens the possibility of price competition." *Id.* at 689. And such reduced access, privacy, and competition suffice to show that the restriction "would impair the exercise of the constitutional right" and is thus presumptively unconstitutional. *Id.* at 690 (internal quotation marks omitted).

7

To be sure, the rights to abortion, contraception, and assistance of counsel belong to the buyer of such goods and services, not the seller. Yet because restrictions on the ability to sell can "impair the exercise" of the buyer's rights, they too are subject to constitutional scrutiny.

The same reasoning applies to the similar context of guns. Just as getting a safe abortion requires the services of a doctor, using contraceptives generally requires that the contraceptives be manufactured and sold, and assistance of counsel requires a counsel who assists (and is usually paid to assist), so keeping and bearing arms usually requires someone who will sell the arms.

## II. The power to regulate the sales of constitutionally protected goods and services does not include the power to prohibit them.

The government's power to enact "laws imposing conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 626-27, does not include total bans on the sale of arms within a jurisdiction. Though the government may to some extent regulate the exercise of constitutional rights, those regulations are unconstitutional if they go too far.

8

Thus, for instance, as the preceding Part noted, the government's power to impose conditions and qualifications on who may provide abortions does not extend to laws that require all abortions to take place in licensed hospitals. *Doe v. Bolton*, 410 U.S. at 194-95. Likewise, the right to use contraceptives "does not . . . automatically invalidate every state regulation in this area. The business of manufacturing and selling contraceptives may be regulated in ways that do not infringe protected individual choice." *Carey*, 431 U.S. at 685-86. But laws requiring that contraceptives be sold only by pharmacists unduly burden that right, and are unconstitutional. *Id.* at 689.

Similarly, though zoning restrictions may sometimes "regulate[] activity protected under the First Amendment," that is so only when the restriction "impose[s] a minimal burden on protected speech." *Schad*, 452 U.S. at 71 (discussing *Young v. American Mini Theatres, Inc.*, 427 U.S. 50 (1976)). That some restrictions on adult theaters, for instance, are allowed does "not imply that a municipality could ban all adult theaters—much less all live entertainment . . .—from its commercial districts citywide." *Id.* And the power to limit the amounts of campaign contributions, *Buckley*, 424 U.S. at 28-29, does not include the power to

9

impose limits that are too low, *Randall v. Sorrell*, 548 U.S. 230, 250-53, 264, 273 (2006) (lead op.; Kennedy, J., concurring in the judgment; and Thomas, J., concurring in the judgment), much less the power to ban contributions outright.

*Heller*'s brief reference to "laws imposing conditions and qualifications on the commercial sale of arms" must be read in light of this longstanding case law. That "conditions and qualifications" are allowed does not mean that outright prohibitions—laws that entirely forbid the commercial sale of arms within the entire territory over which a county government has jurisdictions—would be allowed as well.

## III. Governments may not entirely ban the sale of constitutionally protected goods and services within their jurisdiction.

California law lets county governments impose zoning conditions only in unincorporated areas within the county. "[T]he California Constitution specifies that the police power bestowed upon a county may be exercised 'within its limits,' i.e., only in the unincorporated area of the county." *City of Dublin v. County of Alameda*, 14 Cal. App. 4th 264, 274-75 (1993) (citations omitted). "Ordinances enacted by the [County Board of Supervisors] in the zoning and other regulatory fields are effective

only in the unincorporated territory." *Stirling v. Board of Supervisors*, 48 Cal. App. 3d 184, 187 (1975). Zoning in incorporated areas is within the jurisdiction of city governments, not the county government. Plaintiff's complaint thus alleges that Alameda County's zoning rules totally ban gun stores, panel op. at 26, everywhere that Alameda County has the power to ban them.

Nor should it matter that gun stores are available nearby, but outside the County's jurisdiction. As Justice Blackmun noted in his concurrence in *Schad*—a case in which the Supreme Court struck down a total ban on live entertainment in a small town—a person's constitutional rights cannot "be contingent upon the availability of such opportunities in [a] 'nearby' [municipality], a community in whose decisions [the person] would have no political voice." 452 U.S. at 78 (Blackmun, J., concurring). And indeed the Court has concluded that the government must "refrain from effectively denying . . . a reasonable opportunity to open and operate an adult theater *within the city*," and stated that the government may not "completely ban[]" certain modes of speech *"within the municipality*." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41,

11

54 (1986) (emphasis added); *City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994) (emphasis added).

Unsurprisingly, other courts that have had to consider total bans on Second-Amendment-protected commercial activities in a jurisdiction have likewise held that such bans are unconstitutional. In *Ezell (I)*, the city argued that its ban on firing ranges was constitutional because such ranges were available in nearby suburbs. 651 F.3d at 697. But the Seventh Circuit expressly rejected the view "that the harm to a constitutional right is measured by the extent to which it can be exercised in another jurisdiction." *Id.*

Instead, the court held that, as to the Second Amendment, like the First, exercise of the right "in appropriate places" may not be "abridged on the plea that it may be exercised in some other place." *Id.* (quoting *Schad*, 452 U.S. at 76-77 (internal quotation marks omitted)). "It's hard to imagine anyone suggesting that Chicago may prohibit the exercise of a free-speech or religious-liberty right within its borders on the rationale that those rights may be freely enjoyed in the suburbs. That sort of argument should be no less unimaginable in the Second Amendment context." *Id.* (Indeed, the Seventh Circuit has recently found presump-

12

tively unconstitutional a zoning restriction that fell short of a total ban, but left just "2.2% of the city's total acreage . . . theoretically available" to a particular gun-related use, in that case gun training rather than gun sales. *Ezell v. City of Chicago (II)*, Nos. 14-3312 & -3322, at 3 (7th Cir. Jan. 18, 2017), http://tinyurl.com/ezell-ii.)

And this conclusion makes sense. What a county may do, cities may do, and neighboring counties may do as well. Indeed, because gun regulations (like other regulations) often stem from region-wide or statewide political movements, the same political forces that lead to a regulation being enacted in one jurisdiction will often lead to similar results in nearby jurisdictions. As *Illinois Ass'n of Firearms Retailers v. City of Chicago, 961* F. Supp. 2d 928 (N.D. Ill. 2014), reasoned in striking down a citywide gun sales ban, "if all cities and municipalities can prohibit gun sales and transfers within their own borders, then all gun sales and transfers may be banned across a wide swath of the country if this principle is carried forward to its natural conclusion." *Id.* at 939.

To be sure, one can imagine a judicial regime in which Alameda County (1) may ban gun stores in incorporated areas so long as there are gun stores in neighboring cities, but (2) this county ban would then

become unconstitutional once the cities enact similar bans, on the grounds that residents of unincorporated areas would then no longer have reasonable access to gun stores.

Yet such a regime would have little to recommend it. It would mean that a county ordinance that is constitutional today would become unconstitutional tomorrow, based on the political decisions of an entirely separate jurisdiction. And then presumably the ordinance might spring back into constitutionality, as some other jurisdiction relaxes its zoning controls. That is not an administrable approach, nor one that respects the constitutional rights of each jurisdiction's residents.

## IV. Restrictions on constitutionally protected activity must be justified with real evidence, rather than bare speculation.

A ban on gun stores, no less than a restriction on adult bookstores or a ban on live entertainment, must be supported with real evidence rather than resting on speculation or inapt analogies. Thus, for instance, the Court in *Schad* rejected the Borough of Mt. Ephraim's ban on live entertainment on the grounds that the Borough "presented no evidence, and it is not immediately apparent as a matter of experience, that live

entertainment poses problems . . . more significant than those associated with various permitted uses." 452 U.S. at 73.

The Court in *Carey* likewise struck down the ban on contraceptive sales by nonpharmacists because there was no evidence that such sales were particularly harmful to health and safety, 431 U.S. at 690-91; same for the *Doe v. Bolton* Court's striking down the ban on abortions provided outside hospitals, 410 U.S. at 193-95. And the Court in *Renton*, 475 U.S. at 51-52, upheld the restriction on where adult theaters may be located only after noting that the city had pointed to studies from nearby cities that showed such theaters caused harmful "secondary effects," such as crime, *id.* at 48 (likely referring to prostitution, *see Young*, 427 U.S. at 55; *Renton*, 475 U.S. at 46 (relying heavily on *Young*)).

Unsurprisingly, then, the recent Seventh Circuit decision in *Ezell (II)* held that the government must introduce real evidence supporting its gun controls, including zoning ordinances. *Ezell (II)*, slip op. at 12-15. The Third and Sixth Circuits, sitting en banc, held the same recently in *Binderup v. U.S. Attorney General*, 836 F.3d 336 (3d Cir. 2016) (en banc), and *Tyler v. Hillsdale County Sheriff's Dep't*, 837 F.3d 678 (6th

15

Cir. 2016) (en banc), as to other gun restrictions that were also evaluated under intermediate scrutiny, the same test applicable to zoning ordinances that affect constitutional rights, *Renton*, 475 U.S. at 47. *Binderup*, 836 F.3d at 350-56 (lead op.), 374-79 (Hardiman, J., concurring in part and concurring in the judgments); *Tyler*, 837 F.3d at 693-99 (lead op.), 713-14 (Sutton, J., concurring in most of the judgment). And this is sound: When a constitutional right is restricted, especially by a total ban on sales in a jurisdiction, the government should justify the restriction using something more than just the speculation allowed under the "rational basis" test. *See Heller*, 554 U.S. at 628 n.27.

*Amici* believe that the government would be unable to justify the restriction with any real evidence. Theaters that show pornographic movies, *Renton* and *Young* reasoned, draw people who—especially after having seen the movie—may be immediately inclined to seek out prostitutes near the theater. *Young*, 427 U.S. at 55 (referring to the risk of prostitution as the main risk of crime stemming from adult theaters); *Renton*, 475 U.S. at 46 (relying heavily on *Young*). But there is no reason to think that people who buy a gun, and then pick it up 10 days later (as California's waiting period law requires, Cal. Penal Code §

16

26815(a)), will be immediately inclined to criminally misuse it near the store. First, those buyers will on average be quite law-abiding, because only people without substantial criminal records may legally buy a gun in a gun store. And second, even if someone with criminal designs does buy a gun in a gun store, it is highly unlikely that those designs will involve a crime to be committed right next to the store. *See* Bureau of Alcohol, Tobacco, Firearms & Explosives, *Firearms Trace Data – 2015 / Time-to-Crime – Firearms Recovered and Traced in the United States and Territories,* https://www.atf.gov/about/firearms-trace-data-2015 & https://www.atf.gov/docs/finalttc-cy2015xlsx/download (data showing that nearly 97% of all traced crime guns recovered in California were bought from a licensed gun dealer more than 3 months before they were used in crime; the average time-to-crime was over 13 years).

But in any event, the government should have to try to make its case to the district court. If the government can show that gun stores do have unusual "secondary effects" of the sort that adult theaters have been found to have, then the district court might rule in the government's favor. But standard constitutional principles require the government to offer real evidence in support of its position.

17

**Conclusion**

The panel opinion applied standard constitutional principles to the Second Amendment, just as they have been applied before to the First Amendment, to reproductive rights, and to other rights. This Court ought to reaffirm that decision.

Respectfully Submitted,

s/ <u>Eugene Volokh</u>
Attorney for *Amici Curiae*

18

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,403 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Office 365 Word in 14-point New Century Schoolbook.

Dated: January 25, 2017

s/ Eugene Volokh
Attorney for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Brief *Amici Curiae* with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January 25, 2017.

All participants in the case are registered CM/ECF users, and will be served by the appellate CM/ECF system.

Dated: January 25, 2017

s/ <u>Eugene Volokh</u>
Attorney for *Amici Curiae*